**FILED**

December  15, 2021
Jeanne A. Naughton, CLERK
United States Bankruptcy Court
Newark, NJ

By: *Juan Filgueiras,* Courtroom Deputy

| | |
|---|---|
| UNITED STATES BANKRUPTCY COURT DISTRICT OF NEW JERSEY | |
| In Re | Case No.:        19- 30818 (VFP) |
| JUSTIN SCHNEIDER, | Chapter:        7 |
| Debtor. | |
| ROCK REAL ESTATE VENTURES LLC, | |
| Plaintiff, | Adv. Pro. No.: 20-1060 (VFP) |
| v. | |
| JUSTIN SCHNEIDER, | |
| Defendant. | Judge Vincent F. Papalia |

## OPINION

**APPEARANCES**

**SCURA, WIGFIELD, HEYER & STEVENS**
David L. Stevens, Esq.
1599 Hamburg Turnpike
Wayne, NJ  07470
Attorneys for Plaintiff

**CULLEN AND DYKMAN LLP**
Michelle McMahon, Esq.
Amanda A. Tersigni, Esq.
44 Wall Street
New York, NY  10005
Attorneys for Defendants

**VINCENT F. PAPALIA, Bankruptcy Judge**

## I.   INTRODUCTION

This is the Opinion after trial that the Court conducted on July 28, 2021 in this adversary proceeding.  Plaintiff, Rock Real Estate Ventures LLC ("Plaintiff" or "Rock"), commenced this proceeding by filing a Complaint on February 5, 2020 to except from discharge under 11 U.S.C. § 523(a)(2)(A) a judgment in the amount of $830,715.06 (the "Judgment") entered on June 28, 2019 in *Rock Real Estate Ventures, LLC v. Tom Riley*, Superior Court of New Jersey (the "State Court"), Law Division, Hudson County, Dkt. No. HUD-L-1235-18 (the "State Court Action"). The Judgment was entered jointly and severally against debtor, Justin Seth Schneider (the "Debtor"), and his co-defendants.  For the reasons set forth below, the Court finds that Plaintiff did not satisfy its burden under 11 U.S.C. § 523(a)(2)(A) to except the Judgment from discharge and dismisses the Adversary Complaint without costs to either party.

## II.   JURISDICTIONAL STATEMENT

The Court has jurisdiction over this matter under 28 U.S.C. § 1334(b) and the Standing Orders of Reference entered by the United States District Court on July 10, 1984 and amended on September 18, 2012.   This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (I) (determinations as to the dischargeability of particular debts) and (O).  Venue is proper in this Court under 28 U.S.C. § 1408.  The Court issues the following findings of fact and conclusions of law pursuant to Fed. R. Bankr. P. 7052. To the extent that any of the findings of fact might constitute conclusions of law, they are adopted as such. Conversely, to the extent that any conclusions of law constitute findings of fact, they are adopted as such.

### III.    STATEMENT OF RELEVANT FACTS AND PROCEDURAL HISTORY

A. <u>Background as to Parties</u>

The Plaintiff, Rock Real Estate Ventures LLC, was founded in 2017 by Matthew Rodrigue ("Rodrigue") "to acquire residential houses at sheriff sale, renovate those, and then resell them."[1] Rodrigue serves as the managing member, and an unidentified investor (serving as a limited member) was the only other member.[2]  Before Rodrigue formed Rock, he was already operating an entity called The Green Rock Group, which purchased nonperforming mortgage debt, foreclosed and resold the property without renovation.[3]  Before Rock, Rodrigue had "no experience in any type of construction."[4]  Rodrigue described Ken Majmudar ("Majmudar"), "a wealth advisor . . . by trade," as a hard-money lender (at 12% interest) for the properties that Rock planned to acquire at auction.[5]  The "business plan" for Plaintiff was to turn the properties around quickly ("If you do four deals with the same capital, it's better than doing two deals with the same capital").[6]  Rodrigue projected that Plaintiff would do "20 to 40 deals a year . . . flipping houses from sheriff sale."[7]

Majmudar introduced Debtor, Justin Schneider (the "Debtor"), to Rodrigue.  Majmudar identified Debtor as the builder of Majmudar's own home in Harding, New Jersey, and as a potential investor in future projects.[8]  Majmudar's opinion of Debtor was important to Rodrigue ("I had relied heavily on [Majmudar's] referral [of Debtor] at the time").[9]

---

[1] July 28, 2021 Trial Tr. 9:16-21, Dkt. No. 60.
[2] Trial Tr. 9:22-25, Dkt. No. 60.
[3] Trial Tr. 9:8-16, Dkt. No. 60.
[4] Trial Tr. 11:2-3, Dkt. No. 60.
[5] Trial Tr. 13:1-6; 12:14-17; 22:7-23:1, Dkt. No. 60.
[6] Trial Tr. 22:12-16, Dkt. No. 60.
[7] Trial Tr. 13:7-9, Dkt. No. 60.
[8] Trial Tr. 12:14-24, Dkt. No. 60.
[9] Trial Tr. 12:25-13:1, 33:21-34:4, Dkt. No. 60.

3

Rodrigue first met Debtor in December 2016 and several times afterwards for lunch.[10] Rodrigue inspected three properties on which Debtor had previously performed services (including Majmudar's Harding, New Jersey home) and reviewed a thirty-page brochure that Debtor had compiled for another property.[11] Rodrigue testified that Debtor's role with respect to the properties that Debtor himself bought and renovated for resale was as investor, overseer, selector of materials.[12] Rodrigue was not sure who served as the general contractor on Debtor's prior projects but testified that Debtor said he used subcontractors and confirmed that Debtor was not "swinging the hammer."[13]

### B. The Westfield and Madison Projects

Plaintiff and Rodrigue worked with Debtor on a total of five projects,[14] but only two are the subject of the State Court Judgment that is in issue in this Adversary Proceeding:

> 816 Columbus Avenue, Westfield, New Jersey ("Westfield," or the "Westfield Property")
> 45 Greenwood Avenue, Madison, New Jersey ("Madison," or the "Madison Property").[15]

The Westfield Property and the Madison Property are sometimes collectively referred to as the "Properties" or the "Projects" and individually as a "Project."

Rodrigue asked Debtor and Tom Riley ("Riley"), Debtor's business partner (as Rodrigue described him), to bid on these Projects.[16] Debtor identified Riley to Rodrigue as the contractor that Debtor had used on all his projects.[17] Rodrigue stated that Debtor and Riley together had completed every Debtor-project that Rodrigue had inspected before asking Debtor to bid on

---

[10] Trial Tr. 13:17-14:1, Dkt. No. 60.
[11] Trial Tr. 14:22-15:16, Dkt. No. 60.
[12] Trial Tr. 14:12-21, Dkt. No. 60.
[13] Trial Tr. 14:12-21, Dkt. No. 60.
[14] Trial Tr. 56:1-6, Dkt. No. 60.
[15] Trial Tr. 11:13-16, Dkt. No. 60.
[16] Trial Tr. 15:17-16:13, Dkt. No. 60.  Debtor and Riley had already passed on a smaller project that they could not complete in Plaintiff's required time frame.  Trial Tr. 15:17-25, Dkt. No. 60.
[17] Trial Tr. 16:4-7, Dkt. No. 60.

projects.[18]  Although Rodrigue first indicated that he was not sure of Riley's specific role, Rodrigue

acknowledged on cross-examination that Riley was the general contractor on the Westfield and

Madison Property Projects, as well as all three of the other projects the parties worked on

together.[19]  Riley was deceased by the time of the July 28, 2021 trial.[20]

Rodrigue provided Debtor with floor plans for both the Westfield Property and the Madison

Property.[21]  Debtor testified that the parties originally contemplated that they would be joint

venture partners with respect to these Projects.[22]  Debtor also testified that the relationship

switched to project manager (Schneider) and general contractor (Riley) for both Projects because

there was not enough profit in the Projects for a joint venture.[23]  Rodrigue testified that he had

engaged Debtor for "project management construction services," a statement that is generally

consistent with the Debtor's description of his role.[24]

Debtor described himself as a real estate investor, who renovates and flips houses, and as

a real estate consultant, who has "helped . . . investors with the acquisition, development, financing

and the leasing of properties."[25]  Debtor acknowledged that Majmudar (who "was one of my major

investors") introduced Debtor to Rodrigue.[26]  Debtor introduced Riley to Rodrigue to serve as the

contractor on the projects that Debtor did with Rodrigue.[27]  Debtor corroborated that Rodrigue

hired Debtor "to help him keep the accounting, to pay the subs . . . to help him purchase materials

---

[18] Trial Tr. 16:5-10, Dkt. No. 60.
[19] Trial Tr. 45:21-46:4, Dkt. No. 60.
[20] Trial Tr. 70:18-24, Dkt. No. 60.
[21] Trial Tr. 16:14-23, Dkt. No. 60.
[22] Trial Tr. 130:25-131:11, Dkt. No. 60.
[23] Trial Tr. at *id.* and 64:7-65:1, Dkt. No. 60.
[24] Trial Tr. 30:2-4, Dkt. No. 60.
[25] Trial Tr. 62:20-63:7, Dkt. No. 60.
[26] Trial Tr. 63:8-10, Dkt. No. 60.
[27] Trial Tr. 64:9-18, Dkt. No. 60.

. . to handle the payroll . . . .".[28]  Debtor described the parties' payment routine:  Riley would give Debtor a weekly sheet of payroll, contractor and subcontractor costs, if any, and Debtor would discuss them with Rodrigue.[29]  Rodrigue would make an electronic deposit into a Chase bank account that Debtor and Rodrigue agreed to open; Debtor kept track of invoices through a Quicken® account.[30]

On or about February 1, 2017, Rodrigue and Debtor attempted to walk through the Westfield Property but could not gain access, as Plaintiff did not complete purchase of Westfield until March 15, 2017.[31]  Rodrigue and Debtor were able to enter the Westfield Property on their second visit on March 24, 2017.[32]  Plaintiff had originally planned to knock down the existing structure and build ground-up construction, but, between the February 1, 2017 and March 24, 2017, "we switched gears," and the Project became one of renovation rather than knock-down.[33]  During the March 24, 2017 walk-through, Debtor provided a budget of $135,000 for the Westfield Project.[34]  Rodrigue later emailed Debtor a full set of construction drawings ("CDs") for Westfield.[35]  Debtor confirmed the viability of the $135,000 budget number with Riley and then also confirmed it with Plaintiff.[36]

For the Madison Property, Rodrigue testified that Debtor agreed to a budget of $45,000 after a walk-through, review of construction drawings and, to Rodrigue's understanding, review of the matter with Riley.[37]

---

[28] Trial Tr. 64:21-65:3, 67:11-16, Dkt. No. 60.  Debtor testified that Rodrigue, Majmudar and he originally expected to enter a joint venture agreement but did not do so.
[29] Trial Tr. 83:3-10, Dkt. No. 60.
[30] Trial Tr. 83:10-25, Dkt. No. 60.
[31] Trial Tr. 16:14-17:2; 18:10-24, Dkt. No. 60.
[32] Trial Tr. 18:18-24, Dkt. No. 60.
[33] Trial Tr. 18:4-10; 18-19:8, Dkt. No. 60.
[34] Trial Tr. 20:5-21:18, Dkt. No. 60.
[35] Trial Tr. 16:21-17:18, Dkt. No. 60.
[36] Trial Tr. 21:4-18, Dkt. No. 60.
[37] Trial Tr. 27:2-13, Dkt. No. 60.

C. <u>Timing for Completion of the Projects, Insurance and the Lack of a Written Contract</u>

Rodrigue initially testified that Debtor told him Debtor could complete the jobs in three months.[38]  However, on cross-examination, Rodrigue acknowledged that, during his deposition, he testified that he thought the Westfield Project would take six months and that the Madison Project would take three to four months.[39]  Rodrigue also testified that a sequence of emails dated March 29, 2017 confirmed the scope of the work and the $135,000 budget for the Westfield Property.[40]  Additionally, the State Court found that, on or about April 1, 2017, the parties finalized their agreement (in written and oral communications) and that "target completion dates" were agreed to for both Projects:  July 15, 2017 for Westfield and May 15, 2017 for Madison.[41]

Debtor told Rodrigue in a February 15, 2017 email (under a reference line for the Westfield Property) that Rodrigue would need "construction insurance" and that Debtor would provide Rodrigue with a construction agreement:

> You will also need construction insurance.  If you need someone, I can recommend a guy I use.
>
> I am working on the construction agreement and will get it to you as soon as I am done – shortly.[42]

Despite the apparently clear text of this email, on both direct and cross-examination, Debtor testified unconvincingly that, by "construction agreement," he meant "joint venture agreement" and declared that:  (i) because he ultimately did not enter a joint venture with Rodrigue and Majmudar, he was not required to generate any written agreement at all; and (ii) to the extent a

---

[38] Trial Tr. 22:2-4, Dkt. No. 60.

[39] Trial Tr. 46:12-47:25, Dkt. No. 60.

[40] Trial Tr. 24:12-25:2; 25:24-26:4, Dkt. No. 60; Mar. 29, 2017 emails, Ex. D-4.  References are to Debtor-defendant's Trial Exhibits, unless otherwise stated.  Plaintiff's five admitted Trial Exhibits (except for the June 28, 2019 State Court Opinion) are all included in Debtor-defendant's.  Both parties' Trial Exhibits are indexed and cross-referenced at page 2 of the July 28, 2021 Trial Transcript, Dkt. No. 60.

[41] June 28, 2019 State Court Opinion, at 4, Ex. P-1 ("Op.").

[42] Trial Tr. 30:23-31:22, Dkt. No. 60; Feb. 15, 2017 email, Ex. D-3.

"construction agreement" was required, it was the obligation of Riley as general contractor and not of Debtor to generate it.[43]   In any event, the State Court found that the Debtor never produced the written agreement he represented he would provide, and this Court is not only bound by that finding, but also agrees with it.[44]   As will be seen below, the issue for this Court is whether breach of that promise (among others) rises to the level of a fraud under 11 U.S.C. § 523(a)(2)(A).

Rodrigue's February 16, 2017 response to Debtor's February 15, 2017 email did not address the need for a written contract but did refer to insurance and suggested the next steps for moving forward:

> We will have inspections we need done in coordination with our architect and insurance we need as owners in place, contractors will also need their own builders insurance et al.
>
> I think the best way for contract pricing is to do plans then walk through what will actually be constructed. . . .
>
> So I'm going to have the plans done asap then we can go through them together.[45]

Debtor responded on February 16, 2017:

> We have builder's insurance but as the owner of the house you still need insurance – unfortunately.[46]

Rodrigue testified that he understood Debtor's last statement above to mean that Debtor and Riley had builder's insurance and that builder's insurance is necessary to provide protection against nonperformance, poor workmanship, theft of materials.[47]   Rodrigue never asked for or received proof of this insurance.  When asked by Rock's counsel why he would fund the Projects and allow the Debtor to continue the work for him without proof of this insurance (or a written

---

[43] Trial Tr. 66:5-67:16 (direct); 112:19-115:9 (cross), Dkt. No. 60.
[44] Op., at 3-5.
[45] Feb. 16, 2017 email, Ex. D-3.
[46] Feb. 16, 2017 email, Ex. D-3.
[47] Trial Tr. 31:14-32:8, Dkt. No. 60.

contract), Rodrigue testified that he relied "heavily" on the referral from Majmudar, the other Debtor projects he had visited (including Majmudar's home), Debtor's thirty years of experience and his asserted favorable relationships with suppliers and contractors.[48]

Debtor started work on the Madison Property on or about March 17, 2017 (less than two months before its original targeted completion date) and the Westfield Property on or about April 1, 2017 (about three-and-a-half months before the original targeted completion date).[49] There is no dispute that work on both Projects commenced without a written contract or proof of insurance.

Debtor also testified that Riley maintained liability insurance through 2018.[50] At trial, Debtor introduced into evidence two Certificates of Liability Insurance issued by Streetsmart Insurance/Utica First Insurance Co. to Riley's company, Thomas Riley Residential Construction, LLC, for policy periods August 31, 2016 through August 31, 2017 and August 31, 2017 through August 31, 2018.[51] Debtor testified that this is mandatory liability insurance for contractors (but did not directly state that it is a construction or builder's insurance policy).[52] Nothing on the face of the Certificate specifically identifies coverage for the Westfield or Madison Properties or Projects, though it is liability insurance that names Riley's company as the insured.[53]

On cross-examination, Debtor, in a manner similar to his insistence that it was not his job to produce a construction agreement, deflected Plaintiff's questions about whether the Westfield and Madison Property Projects were covered by builder's insurance.[54] Debtor insisted that Riley

---

[48] Trial Tr. 32:11-34:4, Dkt. No. 60 (also noting that Majmudar was an influential person who was providing 80% of the capital for Rock's deals and a lender who was potentially interested in doing future deals).
[49] Trial Tr. 90:5-7, Dkt. No. 60.
[50] Trial Tr. 80:6-11, Dkt. No. 60.
[51] Trial Tr. 80:12-17; 82:3-20, Dkt. No. 60; Ex. D-1.
[52] Trial Tr. 81:14-25, Dkt. No. 60.
[53] Ex. D-1.  In fact, on each certificate, under the boilerplate that says "Description of operations/locations/vehicles" has been typed:  "Premium for the BOP - $637.43  Borrower's full name:  Megan and Tim Wong, 42 Walker Dr, New Providence NJ 07974."  The boilerplate says that additional pages may be attached, but none are attached.
[54] Trial Tr. 117:22-119:22, Dkt. No. 60.

had builder's insurance -- even though the only declarations page that Debtor ever saw was for liability insurance -- based on his understanding that Riley could not have done his work without it.[55]  Debtor testified: "It wasn't my job to provide it [builder's insurance and/or proof of builder's insurance]."[56]  Asked whether Riley ever showed him proof of insurance for the Westfield or Madison Projects, Debtor testified:  "Again, that wasn't between myself and Mr. Riley, that was between Mr. Rodrigue and Mr. Riley.  He's the one that hired him."[57]  Debtor finally acknowledges that the two Certificates of Liability Insurance from Streetsmart Insurance/Utica First Insurance Co., introduced by Debtor's Counsel, do not reference builder's insurance.[58]

The State Court did not make express findings about the existence, nonexistence or effect of the insurance in its June 28, 2019 Opinion other than to find that Debtor said he and Riley had builder's insurance. Accordingly, this Court must weigh the impact of this testimony and other evidence in determining whether Debtor's representation that he and Riley had builder's insurance amounted to something more than a breach of agreement sufficient to give rise to nondischargeability under § 523(a)(2).[59]

Despite the fact that the Debtor had not produced a written contract or proof of insurance to Rodrigue, on March 29, 2017, Rodrigue emailed Debtor (the email, however, was addressed to "Guys") seeking to move the Projects forward:

Guys,

Just a [sic] wanted to get a simple scope and budget out there for this project so I can send out a deposit and we can get started.

---

[55] Trial Tr. 118:1-119:22, Dkt. No. 60.
[56] Trial Tr. 118:13-14, Dkt. No. 60.
[57] Trial Tr. 119:18-22, Dkt. No. 60.
[58] Trial. Tr. 127:15-17, Dkt. No. 60.
[59] The State Court's finding as to insurance was that Debtor "stated on many occasions that we (meaning Schneider and Riley) have builder's insurance for both construction projects."  Op., at 3.  However, that finding was in the context of the State Court's determination that Debtor held himself out as either Riley's partner or his agent. The State Court did not determine whether or not the insurance existed or whether the failure to provide proof of the insurance amounted to any fraud, which is accordingly the task of this Court.

Plans are attached for your review.  These are not 100% final . . . .[60]

Rodrigue's March 29, 2017 email continued with a description of the potential variants from the attached plans; a schedule of items provided by the architect; a more detailed, nonexclusive schedule of items to be provided by the contractor; and the legend:  "**BUDGET: $135,000** plus Owner provided items."[61]  On the same date, Debtor responded:  "Spoke to Tom [Riley] regarding the below scope and "budget."  Let's move forward."[62]  Rodrigue responded within three hours: "Sounds good, will wire $20,000 today."[63]

In considering these exchanges, this Court acknowledges and accepts the State Court's findings as to the material terms of the parties' agreement.  However, this Court also finds that speed in moving forward was more important to Rodrigue than any written contract or evidence of builder's insurance, as he was plainly comfortable in proceeding without them.  In other words, the relatively high interest rate that Plaintiff was being charged by Majmudar (12%) and the desire to quickly "flip" properties were greater motivating factors for Plaintiff in moving forward than proof of insurance or a written contract.   Further, Rodrigue acknowledged that he worked with Debtor on a total of five projects and that Debtor did not provide a written construction agreement for any of them.[64]  Similarly, there is no evidence in the record the Plaintiff asked for or received proof of builder's insurance in connection with any of these projects.  These facts demonstrate that the written contract and proof of insurance were not required or actually relied upon by Plaintiff in proceeding with any of the projects in which the Debtor and Riley were involved, including Westfield and Madison.

---

[60] Trial Tr. 85:3-86:16, Dkt. No. 60; Mar. 29, 2017 email exchange, Ex. D-4.
[61] Mar. 29, 2017 email exchange, Ex. D-4.
[62] Mar. 29, 2017 email exchange, Ex. D-4.
[63] Mar. 29, 2017 email exchange, Ex. D-4.
[64] Trial Tr. 56:1-9, Dkt. No. 60.

Debtor's April 10, 2017 email (part of an exchange) to Rodrigue indicated that Debtor had not yet received permits for the Westfield and Madison Projects and that Plaintiff had not yet received permission to enter the Westfield Property.[65]  A May 18, 2017 email from Rodrigue to Debtor indicates that Rodrigue was just then collecting the permits for the Madison Property.[66]  By this time, the original "targeted" completion date for the Madison Project (May 15, 2017) had already passed. Significantly, although the demolition work could begin and had started earlier, the Debtor and Riley could not commence the actual construction until the permits were obtained.[67] The Court finds that the delays in obtaining the permits also resulted in delays in completing the Projects.  The "fault" for these delays cannot be placed solely on Debtor but must also be shared by Plaintiff, and, more generally, the unforeseen delays that occurred in connection with these Projects, which are common in many construction contracts.

When "Riley's men" began their work on the Westfield Property, they found it to be in worse shape than the parties thought:

> When Riley's men were demoing the roof they found that all the sheeting on the roof was in horrendous shape. So all of it had to come off and be replaced. In addition eight of the rafters were in really bad shape so they had to replace the rafters, and also make them 2X10s, not -- they were -- I think they were 2x8s, so and the town made them do 2X10s. Plus, when they took off the siding there were issues with some of the sheeting on the siding, so they had to replace. So what might have taken 20 sheeting, he had to put in over 50 CDX [exterior plywood] sheetings.[68]

Debtor testified that these modifications increased the cost of the Westfield Project and caused further delays.[69]  This testimony was not contradicted by Rodrigue.

---

[65] Trial Tr. 103:2-11, Dkt. No. 60; Apr. 10, 2017 email exchange, Ex. D-6.
[66] Trial Tr. 102:1-103:1, Dkt. No. 60; May 18, 2017 email, Ex. D-10.
[67] Trial Tr. 117:18-21.
[68] Trial Tr. 86:21-87:4, Dkt. No. 60.  Rodrigue had testified, *supra*, that the Westfield Project was originally to be a knockdown but that the parties decided on or before the March 24, 2017 site visit to renovate instead.  Trial Tr. 18:4-19:5, Dkt. No. 60.
[69] Trial Tr. 87:8-12, Dkt. No. 60.

The Madison Project also underwent modification and experienced delay (repair of a leak; addition of paneling; packing the foundation; widening of a staircase with concomitant change to plumbing; and an injury to the siding worker, who was hospitalized for a week).[70] Rodrigue either required these modifications or was apprised of them.[71] On June 1, 2017, Rodrigue sent Riley and Debtor an updated budget of $48,850 for the Madison Property with a new targeted or "scheduled" completion date of June 9, 2017.[72] These changes also contributed to the delays.

By late May 2017 or June 2017, Rodrigue began asking Debtor for an accounting, as it became clear that there was not enough money left in the budget(s) to complete the Projects.[73] For example, when Riley advised Rodrigue in a June 22, 2017 email that there was only $4,500 left in the budget for the Westfield Property (the $135,000 Project), Rodrigue estimated that the work was only about one-half complete.[74] Rodrigue, when asked again on direct examination why he continued to make disbursements up to that point without receiving a contract or builder's insurance, testified that, when the "big disbursements" were going out in March and April 2017, "there was work being done."[75] However, as noted above, the actual construction could not commence until the permits were obtained, which was not until sometime in late April or May. Although Rodrigue was at this point plainly becoming concerned about timing, only a relatively short period of time had gone by since the permits were obtained, with change orders and other delays occurring in the interim.

---

[70] Trial Tr. 90:8-91:20; 92:1-93:4, Dkt. No. 60.
[71] Trial Tr. 90:8-91:20; 92:1-93:4; 95:1-6, Dkt. No. 60.
[72] Trial Tr. 94:4-25, Dkt. No. 60; June 1, 2017 updated budget, Ex. D-13.
[73] Trial Tr. 35:21-24; 57:7-58:14, Dkt. No. 60; June 5, 2017 Rodrigue email response to Debtor's nine-page accounting for the Madison Property for Jan. 1, 2017 through May 30, 2017, both at Ex. D-7. Debtor's accounting for the Madison Project (Ex. D-7) shows that Debtor was paid $500/week for the weeks ending March 24, 2017 through May 5, 2017 and $250 for the week ending May 19, 2017, or a total of $3,750 for nine weeks.
[74] Trial Tr. 34:11-19, Dkt. No. 60.
[75] Trial Tr. 35:3-16, Dkt. No. 60. Rodrigue testified that he did not take Debtor and/or Riley and the current crew off the Project when Rodrigue became dissatisfied because he did not want "them" to impress liens on the Westfield Property and impair Rodrigue's ability to hire a new contractor. Trial Tr. 38:20-40:13, Dkt. No. 60.

By late May 2017 or early June 2017, Rodrigue had also stopped communicating with Debtor (except for requesting an accounting and "things of that nature") and either took over the ordering of materials himself or communicated directly with Riley rather than Debtor.[76] Thus, the relationship between the Debtor and Plaintiff deteriorated rapidly, and within two months or less of actually starting the affirmative remodeling work on the Projects, Rodrigue had generally stopped communicating with Debtor altogether.

Debtor states that, after Rodrigue failed "to make two payroll payments" (presumably failed to pay Debtor twice), Debtor walked away from the Projects in early June 2017.[77] In an August 3, 2017 email, Rodrigue formally terminated Debtor, Riley and their respective entities effective August 4, 2017.[78]

As found by the State Court, the Westfield Property required an additional $159,330.24, plus carrying costs of $44,489.14, to complete. The Madison Property required an additional $61,957.53, plus carrying costs of $29,352.96, to complete.[79] In total, the State Court found that Plaintiff suffered damages of $276,905.02 for Defendants' breach of contract.[80] Those damages were trebled pursuant to the NJCFA to the final judgment amount of $830,715.06.[81]

D. <u>State Court Action</u>

On or about March 30, 2018, three entities, (i) the Plaintiff; (ii) 45 Greenwood Madison, LLC; and (iii) 816 Columbus Westfield, LLC filed a three-count complaint in Superior Court of New Jersey, Law Division, Hudson County, Dkt. No. HUD-L-1235-18, against Riley; Tom Riley Residential Construction, LLC; and the Debtor, who was identified on the caption as "a/k/a or

---

[76] Trial Tr. 42:19-43:2; 55:12-25, Dkt. No. 60.
[77] Trial Tr. 96:2-12, Dkt. No. 60.
[78] Trial Tr. 96:13-15, Dkt. No. 60; Aug. 3, 2017 email, Ex. D-19.
[79] Trial Tr. 26:18-20, 27:2-29:6, Dkt. No. 60.
[80] Op., at 5.
[81] Op., at 7.

d/b/a Property Resources and Investments."  The Complaint alleged:  (i) breach of contract; (ii)

violation of the New Jersey Consumer Fraud Act (the "NJCFA"), N.J.S.A. § 56:8-137 and the

relevant implementing regulation, N.J.A.C. § 13:45A-16.2 (the "Regulation"); and (iii) unjust

enrichment (the "State Court Complaint").[82]  The Plaintiff (and co-plaintiffs) sought compensatory

damages (including the cost of remedying and/or finishing the projects) and punitive damages,

which the NJCFA and the Regulation allow.

On June 28, 2019, after a bench trial at which Debtor was not permitted to introduce

evidence or testify because of his prior discovery violations, the State Court issued its combined

*Opinion and Judgment*.  As noted, the State Court awarded the Plaintiff (and co-plaintiffs)

$276,905.02 in compensatory damages for breach of contract on Count One of the State Court

Complaint, trebled under the NJCFA and Regulation (Count Two of the State Court Complaint)

to $830,715.06, which the State Court awarded jointly and severally against the State Court

defendants.[83]  The State Court made the following findings of fact and conclusions of law that are

relevant to the adversary proceeding:

(i)     that a valid agreement existed between the Plaintiff and his co-plaintiffs on one side
        and the Debtor on the other, even though no written contract was ever produced;[84]

(ii)    that the agreement was "ironed out and reflected in" written correspondence and
        verbal communications between January and March 2017 and formally agreed to
        orally on April 1, 2017;[85]

---

[82] Adv. Compl., Mar. 30, 2018 State Court Compl., Ex. A, Dkt. No. 1.

[83] Op., at 6-7.  In the adversary proceeding trial, at the end of Rodrigue's direct testimony, Plaintiff's counsel stipulated that his client accepted the State Court *Opinion and Judgment* as the correct measure of damages.  Trial Tr. 44:4-21, Dkt. No. 60.

[84] Op., at 3-4.  As to the State Court's underlying factual findings, this Court is bound by principles of collateral estoppel and has accordingly accepted and given deference to those findings.  *In re Kim*, 2018 WL 671467, at *33-36; *In re Sevastakis*, 591 B.R. at 206; *cf. In re Molz*, 613 B.R. at 605.  However, in determining whether those factual findings give rise to a claim for nondischargeability, this Court is required to apply differing legal standards and principles, as set forth in section IV.B., *infra*, of this Opinion.

[85] Op., at 4.

(iii)  that Debtor indicated on more than one occasion that he would provide a written agreement, though none was ever completed;[86]

(iv)  that Debtor stated many times that "we (meaning Schneider and Riley) have builders insurance on both projects";[87]

(v)  that Debtor "held himself out as either a partner with, or agent for, Mr. Riley with relation to both construction projects";[88]

(vi)  that Debtor breached the contract;[89]

(vii)  that the Plaintiff (and co-plaintiffs) suffered damages as a result;

(viii)  that defendants violated the NJCFA and Regulation by committing certain "'unlawful practices'";

(ix)  that the Plaintiff (and co-plaintiffs) were entitled to judgment against all defendants, jointly and severally, for $830,715.06.[90]

E.  The Bankruptcy Case and This Adversary Proceeding

On November 1, 2019 (about four months after the State Court Opinion and Judgment), the Debtor filed his voluntary Chapter 7 petition.[91]  On February 5, 2020, the Plaintiff filed the instant one-count Adversary Complaint in a timely manner to except the $830,715.06 Judgment from discharge under 11 U.S.C. § 523(a)(2)(A).[92]  The Debtor received his discharge of all other dischargeable debts on February 14, 2020.

The Complaint before this Court alleged various fraudulent representations by Debtor, including that the Debtor stated builder's insurance was in place for the Projects, that he would provide a written contract and had favorable relationships with suppliers and contractors that would reduce the costs of the Projects, and that the Projects would be completed by certain "target"

---

[86] Op., at 4.
[87] Op., at 3.
[88] Id.
[89] Op., at 5.
[90] The State Court entered the Judgment for $830,715.06 against all defendants jointly and severally.  Op., at 6, 7.
[91] Nov. 1, 2019 Pet. ¶ 17, Main Dkt. No. 1.
[92] Adv. Compl., Dkt. No. 1.

dates. Additionally, as is described in more detail below, Plaintiff alleged that Debtor failed to account for the funds advanced by Plaintiffs and improperly used those funds for other purposes. These claims are defined in this Opinion as the "Accounting/Misappropriation Claims" and were the subject of Debtor's first summary judgment motion, as described in the next section. The trial of this proceeding took place on July 28, 2021. Only Rodrigue and the Debtor testified. Post-trial submissions were made by the parties through August 25, 2021, at which time the record was closed.

F.  Debtor's Prior Summary Judgment Motions and the Dismissal of Plaintiff's Accounting/ Misappropriation Claims

A primary focus of Plaintiff's Complaint in this Court was that the Debtor: (i) could not account for the disposition of approximately two-thirds of the funds advanced by the Plaintiff ($120,560.77 of the $186,256.88 advanced); (ii) requested additional advances from Plaintiff without ever performing the services required by the parties' agreement; (iii) had not paid all subcontractors; (iv) could not reconcile all the monies paid by Plaintiff to Debtor; (v) falsified the accounting provided to Plaintiff and paid himself $500 per week, without disclosure to or authorization from Plaintiff; (vi) misrepresented the number of workers on the Projects; and (vii) charged Plaintiff for services not performed on Plaintiff's Projects and/or used funds advanced by Plaintiff for other projects or other improper purposes (collectively, the "Accounting/ Misappropriation Claims").[93]

The focus of Plaintiff's nondischargeability action on these alleged Accounting/ Misappropriation Claims was further highlighted by Plaintiff's motion to reopen discovery after Debtor filed his initial summary judgment motion.[94] By that motion, Plaintiff sought to reopen

---

[93] Adv. Compl. ¶¶ 17-18, 24(b)-(f), Dkt. No. 1.
[94] Nov. 16, 2020 Mot. to Reopen Discovery, Dkt. No. 24.

and to extend discovery primarily to address the Debtor's alleged "mishandling" of Plaintiff's

funds and failure to "adequately account" for Plaintiff's advances.  For example, Plaintiff's counsel

certified that:

> **The monies paid out to Defendant by Plaintiff have not been adequately accounted for.**
>
> **Further inquiry must be made into Defendant's numerous misrepresentations regarding his handling of Plaintiff's money.**[95]

Plaintiff's Motion to Reopen Discovery was granted in part and denied in part.  Plaintiff

was permitted to depose the Debtor, Debtor was required to produce his tax return after the Court's

*in camera* review and Plaintiff was granted leave to seek the deposition of any subcontractors on

the Projects who Plaintiff alleged were not paid.[96]  After conducting Debtor's deposition and

receiving the tax return and any other additional documents from Debtor, Plaintiff advised the

Court that it did not seek to take the deposition of any subcontractors and was ready to respond to

Debtor's summary judgment motion.

In subsequently opposing Debtor's motion for summary judgment, Plaintiff did not address

or provide any support for its claims that the Debtor failed to properly account for the funds

advanced by Plaintiff; that Debtor had not paid subcontractors on the Projects, or used the funds

advanced by Plaintiff for the Projects for other, improper purposes; that Debtor charged Plaintiff

for work or services not performed on the Projects or any of the other Accounting/

Misappropriation Claims alleged by Plaintiff in its Complaint.  In contrast, in support of his

summary judgment motion, the Debtor provided two detailed accountings (one for each Project)

---

[95] Dec. 4, 2020 Suppl. Certif. of David L. Stevens, Esq. in Support of Plaintiff's Mot. to Reopen Discovery Pursuant to Federal Rule of Civil Procedure 16(b)(4), Dkt. No. 29 (emphases and bold in original).

[96] Dec. 17, 2020 Order Granting in Part and Denying in Part the Application of [Plaintiff] to Reopen Discovery, Dkt. No. 32.

which identified each of the advances and disbursements relating to the Projects from funds advanced by Plaintiff, including the $500 weekly payment to Debtor.[97]

Based on this failure of proofs by Plaintiff, this Court granted partial summary judgment in favor of Debtor dismissing with prejudice all Plaintiff's Accounting/Misappropriation Claims.[98] As a result, the limited remaining issues reserved for trial were based on Debtor's alleged misrepresentations regarding:  (i) insurance for the Projects; (ii) Debtor's failure to provide a written contract for the Projects; (iii) the price of labor and materials; and (iv) the dates by which the Projects would be completed.[99]  Another more general surviving issue was whether the rulings in the June 28, 2019 State Court Opinion and Judgment warranted a bar of the Debtor's discharge of Plaintiff's claim, which included the alleged misrepresentations regarding the dates by which the Projects would be completed (collectively, the "Surviving Issues").  This final issue, which was not vigorously argued by either party, is a purely legal one which will be addressed at the end of this Opinion.

The Court will address the remaining Surviving Issues by considering the "totality of the circumstances," *see, e.g.*, *In re Bocchino*, 794 F.3d 376, 382 (3d Cir. 2015), in determining whether the Debtor intended to deceive Plaintiff.[100]  Those circumstances include Plaintiff's initial—and now dismissed—claims that Debtor failed properly to account for the funds advanced by Plaintiff and/or used those funds for improper purposes.  As will be set forth in more detail below, Plaintiff's

---

[97] Oct. 30, 2020 Certif. of Justin Schneider in Support of Debtor's Mot. for Summary Judgment, Exs. A and B, Dkt. No. 20-5.
[98] Mar. 11, 2021 Order Partially Granting and Partially Denying the Debtor's Mot. for Summary Judgment ¶ 3, Dkt. No. 38.
[99] Mar. 11, 2021 Order ¶ 2, Dkt. No. 38.
[100] The Court recognizes that the totality of the circumstances is typically considered to infer a fraudulent intent; however, the Court believes that the totality of circumstances should be considered to determine whether or not the Debtor had an intent to deceive.

failure to prove those claims undercuts its general contention that Debtor intentionally misled

Plaintiff.

### IV.    STATEMENT OF LAW AND ANALYSIS

A.  Exception from Discharge Under 11 U.S.C. § 523(a)(2)(A)

1.  The General Standards

11 U.S.C. § 523 ("Exceptions to discharge") states in full at (a)(2)(A):

(a) A discharge under section 727, . . . of this title does not discharge an
individual debtor from any debt-- . . .

> (2) for money, property, services, or an extension, renewal, or refinancing of
> credit, to the extent obtained by—

> > (A) false pretenses, a false representation, or actual fraud, other than a
> > statement respecting the debtor's or an insider's financial condition.

To except a debt from discharge under 11 U.S.C. § 523(a)(2)(A) (in the context of this

adversary proceeding) the plaintiff must prove that the debtor committed actual fraud, also called

common law fraud.  *Field v. Mans*, 516 U.S. 59, 70 (1995).[101]  To sustain its claim, the Plaintiff

must prove each of the following elements:

(1) the debtor obtained money, property or services through a material
misrepresentation;

(2) the debtor, at the time, knew the representation was false or made with gross
recklessness as to its truth;

(3) the debtor intended to deceive the creditor;

(4) the creditor actually and justifiably relied on the debtor's false representations;
and

(5) the creditor sustained a loss and damages as a proximate result of the debtor's
materially false representations.

---

[101] *Cf. Husky Int'l Electronics, Inc. v. Ritz*, 578 U.S. 356, 359, 365-66 (2016), which determined that § 523(a)(2)(A)
could embrace a fraudulent conveyance claim.

*In re Sevastakis*, 591 B.R. 197, 202 (Bankr. D.N.J. 2018); *In re Altieri*, 2012 WL 3595298, at *3 (Bankr. D.N.J. Aug. 20, 2012)[102]    The Plaintiff must prove [each element of] its claim by preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 288 (1991); *In re Figler*, 391 B.R. 565, 572 (Bankr. W.D. Pa. 2008).

Courts have generally held that "the provisions of section 523(a) are 'strictly construed against creditors and liberally construed in favor of debtors,' owing to the overriding bankruptcy purpose of granting debtors a fresh start." *Molz v. Price*, 613 B.R. 599, 604 (Bankr. D.N.J. 2020) quoting *In re Gallagher*, 2016 WL 4989942, at *2 (Bankr. D.N.J. Sept. 9, 2016) quoting *In re Cohn*, 54 F.3d 1108, 1113 (3d Cir. 1995). On the other hand, the purpose of § 523(a)(2)(A) is "'to prevent a debtor from retaining the benefits of property obtained by fraudulent means and to ensure that the relief intended for honest debtors does not go to dishonest debtors.'" *In re Purington*, 2012 WL 1945510, at *8 (Bankr. D.N.J. May 30, 2012), *appeal denied*, 2013 WL 3442893 (D.N.J. July 9, 2013), quoting *In re Sabban*, 600 F.3d 1219, 1222 (9th Cir. 2010).

In cases involving a debtor-contractor, such as this one, Courts in this Circuit (and others) have generally recognized "two ways to establish misrepresentation or fraud under § 523(a)(2)(A): (1) to show that the contractor executed the contract never intending to comply with its terms, or (2) to demonstrate that the contractor intentionally misrepresented a material fact or qualification when soliciting the work." *Molz v. Price*, 613 B.R. at 604; *In re Purington*, 2012 WL 1945510, at *10 (citing *In re Wiszniewski*, 2010 WL 3488960, at *5 (Bankr. N.D. Ill. Aug. 31, 2010)); *see also e.g.*, *In re Kim*, 2018 WL 671467, at *22 (Bankr. D.N.J. Jan. 31, 2018); *In re Antonious*, 358 B.R. 172, 182 (Bankr. E.D. Pa. 2006). Further, in the debtor-contractor context, general representations

---

[102] The Court in *In re Sevastakis* observed in a footnote that the 3d Circuit has not standardized a "universally-used" test for § 523(a)(2)(A) factors but that the above-quoted represent the "same basic requirements." *In re Sevastakis*, 591 B.R. at 202 n.5.

about expected work performance or poor quality of work (without something more) merely give rise to a breach of contract action and will not suffice to constitute misrepresentation under § 523(a)(2)(A). *See In re Kim*, 2018 WL 671467, at *22; *In re Moeller*, 2014 WL 1315854, at *6 (Bankr. D.N.J. Mar. 31, 2014); *In re Purington*, 2012 WL 1945510, at *10.

Similarly, it is well settled that failure to perform or breach of contract is not, by itself sufficient to give rise to a claim of nondischargeability under § 523(a)(2)(A) for misrepresentation, fraud, or false pretenses. *In re Sachkowsky*, 2021 WL 4823515, at *4 (Bankr. D.N.J. Oct. 15, 2021); *also*, *e.g.*, *In re Hay Phat*, 623 B.R. 371, 380 (Bankr. E.D. Pa. 2021) (collecting cases). Otherwise, virtually all breach of contract actions would be sufficient to establish nondischargeability claims under § 523(a)(2)(A). *In re Sachkowsky*, 2021 WL 4823515, at *4. That is not the law, and this case highlights these important distinctions, as this Court finds no intent to deceive by Debtor, which is required to determine that Debtor's obligation to Plaintiff is nondischargeable.

2. <u>Intent to Deceive</u>

In fraud and nondischargeability cases, it is commonly recognized that "[b]ecause a debtor 'will rarely, if ever, admit that deception was his purpose,' intent to deceive may be inferred from the totality of the surrounding facts and circumstances." *In re Hay Phat*, 623 B.R. at 380 (quoting *In re Reynolds*, 193 B.R. 195, 200 (Bankr. D.N.J. 1996) (and collecting cases)). *See also In re Bocchino*, 794 F.3d at 382. In this case, considering the totality of the circumstances, Plaintiff has failed to meet its burden on this element.

First, as noted above, a principal thrust of Plaintiff's Complaint as originally pleaded was that the Debtor failed to properly account for the funds advanced by Plaintiff and that Debtor misappropriated certain of those funds by failing to pay subcontractors or using them to pay for

22

other properties not related to Plaintiff or the Westfield or Madison Properties.  However, when

Debtor moved for summary judgment to dismiss those claims and supported that motion with two

detailed accountings, Plaintiff's response failed to address or otherwise support its claims with any

evidence at all.  Thus, summary judgment was granted in favor of the Debtor on those claims.

The    Court    finds    that    Plaintiff's    failure    to    provide    support    for    its

Accounting/Misappropriation Claims is contrary to the notion that the Debtor intended to deceive

Plaintiff when the parties entered into their agreement.  Rather than Plaintiff demonstrating any

deception as to these claims, Debtor proved the propriety and accuracy of all the disbursements

made on Plaintiff's behalf, including his relatively modest $500 weekly payment.[103]  Debtor's

detailed and accurate accounting is also at least inconsistent with any claim that Debtor entered

into the agreement with Plaintiff never intending to comply with its terms.  Instead, the Debtor

backed up each of the expenditures made in connection with the Projects through the accountings,

and Plaintiff failed to challenge any of them.  The Court will consider the remaining Surviving

Issues in this context.

    (i)    <u>Timing</u>

There is no doubt that the Projects were not completed by the "target" dates agreed to by

the Debtor, and the State Court so found in determining that Debtor breached their agreement.[104]

However, those dates were only "targets" or estimates and not hard and fast or "Time of the

Essence" deadlines.  Those dates may have been missed at least in part because of Debtor and

---

[103] Rodrigue, in his June 5, 2017 email (Ex. D-7), questioned a few other expenditures in Debtor's accounting but did not raise any issue about Debtor's draw, although Rodrigue testified that he did not know that Debtor was taking the draw until Rodrigue saw this accounting.   Additionally, the State Court noted that Debtor was being compensated for his services but did not include that among the breaches of the agreement. Op., at 2.  Finally, and most importantly for purposes of this decision, on the Debtor's summary judgment motion, Plaintiff did not challenge the $500 weekly payment to Debtor as set forth on the accounting (or otherwise).  Thus, any claim as to those payments was dismissed in any event.
[104] Op., at 2.

Riley's failure properly to perform or perhaps because of overly optimistic predictions by the Debtor, but they were also affected by the unanticipated delays noted above that are common in construction contracts and were present here.

In this case, Debtor also showed, and Plaintiff did not contest, that there were delays in the Projects caused by change orders and in obtaining permits (among other things). As a result, Debtor breached the agreement by failing to complete the Projects by the target dates. However, as was noted above, "general expectations about work performance" or failure to perform are not sufficient (without more) to give rise to nondischargeability for fraud under § 523(a)(2)(A), even though they may constitute breach of contract. And although the completion dates were undoubtedly important to Plaintiff and to Rodrigue, the Court does not believe and cannot find that the Debtor provided the dates with the intent to deceive Plaintiff. Debtor may have underestimated (or failed to foresee) likely delays in seeking to satisfy Plaintiff's emphasis on speed and breached his agreement to complete the Projects by those targeted dates, but he did not intentionally deceive Plaintiff when he provided those dates. Plaintiff failed to satisfy its burden to prove otherwise.

(ii)     <u>Insurance</u>

As to the evidence of builder's insurance, the Court finds that several elements of a nondischargeability claim have not been proven by a preponderance of the evidence. First, as to intent to deceive, it is undisputed that the Debtor told Plaintiff that he and Riley had builder's insurance, and the State Court so found. However, both Projects proceeded without evidence of that insurance (or any written contract) being provided to Plaintiff. This was also the case with the other three projects in which Debtor and Riley performed work for Plaintiff. Further, as to the insurance, the Debtor advised Rodrigue that, although Debtor (through Riley) had certain insurance for the Projects, Rodrigue would have to get his own insurance for certain other risks

that policy did not cover.[105]  Debtor also produced evidence of policies Riley had in effect at the time of the Projects and testified that Riley had to have the insurance in place to maintain his contractor's license.

This Court finds that notwithstanding Debtor's somewhat evasive testimony on this topic, Debtor believed that adequate insurance for the Projects was in place, through Riley, and that he did not intend to deceive Plaintiff about that fact.  Though his testimony about the specific type of insurance required and which Riley had—whether it was builder's, contractor's or liability—was at times defensive and deflective, the Court finds that the Debtor believed that the usual and required insurance for a contractor was in place through Riley.  Further, Debtor's willingness to discuss this issue openly with Rodrigue and to advise him that he also had to obtain his own insurance is inconsistent with an intent to deceive.  Finally, as will be discussed in more detail below, the materiality of the evidence of insurance to Plaintiff and its reliance on it are undercut by Plaintiff's willingness to proceed on these two Projects -- and three others -- with Debtor and Riley without proof of insurance.

(iii)    Debtor's Experience and Relationships with Suppliers and Contractors

Plaintiff understandably asserts that, in entering into the parties' agreement, it relied on Debtor's thirty years of experience in the construction industry and his favorable relationships with suppliers and contractors that would result in better pricing.  Debtor affirmed those representations (or did not deny them).  However, Plaintiff failed to provide any proof that Debtor did not have that experience or those relationships.  Nor did Plaintiff provide proofs of any instances in which Debtor did not provide favorable pricing in connection with contractors and suppliers.  Thus, the

---

[105] Trial Tr. 30:23-31:22, Dkt. No. 60; Feb. 15, 2017 email and Feb. 16, 2017 email, Ex. D-3.

Court determines that the representations were accurate, so there was no intent to deceive, nor any knowingly false statements made in these regards.

(iv)    <u>The Written Contract</u>

Here again, there is no doubt that Debtor promised Plaintiff he would prepare a written contract and failed to do so, as the State Court found.  However, as with the insurance, both these Projects and the other three involving the same parties proceeded without written contracts.  While these facts go more to the reliance element, they are also inconsistent with an intent to deceive, as this was the parties' course of dealing and did not prevent either party from moving forward with both these Projects or any of the others.  Thus, while the failure to provide a written contract may have been a breach of the parties' agreement, it was not a fraud.

In sum, considering the "totality of the circumstances," this Court finds that the Plaintiff failed to prove by a preponderance of the evidence that Debtor intended to deceive Plaintiff as to any of the Surviving Issues.  Since intent to deceive is an essential element of a § 523(a)(2)(A) claim, the court's analysis could end here with a finding of nondischargeability.  *See, e.g.*, *In re Purington*, 2012 WL 1945510, at *13-*14  (after trial, finding contractor's debt to be dischargeable notwithstanding contractor's knowingly false and material misrepresentations, because there was no intent to deceive); *In re Sachkowsky*, 2021 WL 4823515, at *5 (finding contractor's debt to be dischargeable after trial where plaintiff failed to prove an intent to deceive, notwithstanding debtor's failure to make promised payments that induced plaintiff to release necessary certificates).  However, the Court also finds that Plaintiff failed to prove certain other required elements of its § 523(a)(2)(A) claim, as described below.

3.  Justifiable Reliance

(i)  Insurance and the Written Contract

As our Supreme Court has held, § 523(a)(2)(A) requires a showing of "justifiable" rather than reasonable reliance, with justification being a lower threshold.  *Field v. Mans*, 516 U.S. 59, 74-75 (1995); *In re August*, 448 B.R. 331, 350 (Bankr. E.D. Pa. 2011) (same, but also noting that creditor must prove that it actually relied on alleged misrepresentation).  Under this standard, a creditor is not required to make any independent investigation of every representation.  *Id*. at 350-51 (collecting cases).  But this concept is not without limits and requires a creditor to use his or her senses and to determine facts based on the creditor's knowledge and capacity.  *Field v. Mans*, 516 U.S. at 71, citing *Restatement (Second) of Torts* § 540 (1976); W. Prosser, *Law of Torts* § 108, p.718 (4th ed. 1971); and W. Prosser, *et al.*, *Prosser and Keeton on Law of Torts* § 108, p.752 (5th ed. 1984).

As was noted above, Plaintiff, Debtor and Riley worked on a total of five projects together, and in no case was there a written contract or evidence of insurance provided.  By proceeding with these two Projects -- and three others -- without either the written contract or proof of insurance, Plaintiff's actions demonstrate that it did not *actually* or justifiably rely on these representations.  Certainly, Rodrigue – who the Court finds is a sophisticated businessman -- asked about them, and Debtor agreed to provide the written contract, but if they were in reality that important to Plaintiff, it could easily have asked for them again and/or refused to proceed without them.  Instead, it was more important to Plaintiff to move forward with the Projects and limit the accrual of finance costs, so Plaintiff went ahead without them.

In sum, the Court finds that Plaintiff did not actually rely on Debtor's representations as to insurance and a written contract in determining whether to proceed with the Projects. As a result, any such reliance was not justifiable in the circumstances.

(ii)    Debtor's Qualifications and Relationships

The Court finds that Plaintiff was justified in relying on Debtor's stated experience in the industry and his favorable relationships with suppliers and contractors. However, as determined above, these representations were true and therefore cannot form the basis of a § 523(a)(2)(A) claim as there were no material misrepresentations and no intent to deceive. Further, Plaintiff's principal reliance in hiring Debtor was on the basis of the recommendation of Majmudar, who was also providing the financing for the Projects. These representations were from someone else and cannot be attributed to the Debtor. Thus, this Court finds the primary reputational representations relied upon by Plaintiff were those made by Majmudar, which cannot form the basis of a § 523(a)(2)(A) claim against the Debtor because they were not made by him.

4.    Materiality and Knowledge of Falsity

Although the factors in determining nondischargeability are stated separately, they are in many cases related and overlapping. In this case, the representations made by Debtor with respect to the insurance, written contract, his reputation and completion dates were all material parts of the parties' agreement. However, for many of the same reasons noted above, the Court finds that the Debtor did not make them with knowledge of their falsity. The Debtor believed that there was insurance. He also said he was going to provide a written contract but then did not do so, was never pressed on it and the Projects started without them. If he had been asked about the written contract (or insurance), those issues would and could have been easily resolved.

Similarly, as to the completion dates, no evidence was presented that Debtor knew those dates could not be met when he provided them. Instead, there were the delays noted above that resulted in the targets not being met. Many construction contracts are delayed for similar (and other) reasons by a variety of factors, including the change orders and delays in obtaining permits. Those are breaches of contract, not fraud. *See In re Wiszniewski*, 2010 WL 3488960, at *6-*7 (Bankr. N.D. Ill. Aug. 31, 2010) (contractor's general representations regarding standards of expected work performance on contract and oral representations regarding installation of higher quality flooring may constitute breaches of contract or "broken promises" but not misrepresentations for purposes of 11 U.S.C. § 523(a)(2); plaintiff must show more than mere failure to perform); *In re Henderson*, 423 B.R. 598, 622 (Bankr. N.D.N.Y. 2010) ("[s]ubstandard performance or a mere breach of the construction contract do[es] not rise to the level of fraud necessary to except a debt from discharge"); *In re Horton*, 372 B.R. 349, 358 (Bankr. W.D. Ky. 2007) (performance of substandard work does not constitute proof of fraudulent intent).

In this case, and in sum, Plaintiff proved its breach of contract claim, but failed to prove the "something more" that is required to establish a fraud claim under § 523(a)(2)(A). Accordingly, Plaintiff's § 523(a)(2)(A) claim fails, and Debtor's debt to Plaintiff is dischargeable.[106]

---

[106] N.J.S.A. § 56:8-19 ("Action or counterclaim by injured person; recovery of treble damages and costs") states in full:

> Any person who suffers any ascertainable loss of moneys or property, real or personal, as a result of the use or employment by another person of any method, act, or practice declared unlawful under this act or the act hereby amended and supplemented may bring an action or assert a counterclaim therefor in any court of competent jurisdiction. In any action under this section the court shall, in addition to any other appropriate legal or equitable relief, award threefold the damages sustained by any person in interest. In all actions under this section, including those brought the by Attorney General, the court shall also award reasonable attorneys' fees, filing fees and reasonable costs of suit.

N.J.S.A. § 56:8-19.

B.  <u>The Effect of the New Jersey Consumer Fraud Act N.J.S.A. § 56:8-137 and N.J.A.C.
§ 13:45A-16.1 *et seq.* on Plaintiff's Exception to Discharge Claims</u>

In their post-trial submissions, and as noted above, neither party appeared to treat as

material (one way or the other) or directly address the collateral estoppel/*res judicata* effect of the

June 28, 2019 State Court Opinion or of the distinction between the elements of a claim for

common law fraud under 11 U.S.C. § 523(a)(2)(A) and the elements of a claim for consumer fraud

under New Jersey Consumer Fraud Act, N.J.S.A. § 56:8-137 and N.J.A.C. § 13:45A-16.1 *et seq.*

This issue was dealt with on the summary judgment motions and will be briefly addressed here for

purposes of completeness.

As the District Court noted in *Carton v. Choice Point*, 482 F. Supp. 2d 533, 535 (D.N.J.

2007), citing *Cox v. Sears Roebuck & Co.*, 138 N.J. 2, 24 (1994), the elements of a claim under

N.J.S.A. § 56:8-19 of the New Jersey Consumer Fraud Act are:

(1) unlawful conduct by the defendants;

(2) an ascertainable loss on the part of the plaintiff; and

(3) a causal relationship between the defendants' unlawful conduct and the
    plaintiff's ascertainable loss.

*Carton*, 482 F. Supp. 2d at 535 (paragraphing added).  Thus, the elements of intent to deceive and

justifiable reliance that are essential components of a cause of action under 11 U.S.C.

§ 523(a)(2)(A) are missing from the NJCFA cause of action.  The June 28, 2019 State Court

Opinion did not parse N.J.S.A. § 56:8-19[107] but relied entirely on N.J.A.C. §§ 13:45A:16.1, 16A

and 16.2 ("Home Improvement Practices") (three subsections in total), which consist of a

statement of purpose; definitions; and nonexclusive list of unlawful practices in the context of

---

[107] The State Court referred to N.J.S.A. § 56:8-19 in passing at page 7:  "An award of treble damages and attorney's
fees is mandatory under N.J.S.A. 56:8-19 if the Plaintiff proves both an unlawful practice under the Act and an
ascertainable loss.  *Cox v. Sears Roebuck Co.* 138 N.J. 2 (1994)."  Op., at 7.

home improvement.  At page 6 of its Opinion, the State Court generally found that "all of the conduct summarized [in the Opinion] above constitutes a violation of those various provisions of <u>N.J.A.C.</u> (a)16.2 (1-12) [sic]."[108]

However, as many bankruptcy courts have held, and the parties here seem to acknowledge, a finding of a violation of the NJCFA is not necessarily sufficient to prove a nondischargeability claim because the NJCFA applies a strict liability standard to unlawful conduct by contractors while § 523(a)(2)(A) requires actual intent to defraud.  *In re Altieri*, 2012 WL 3595298, at *4; *In re Purington*, 2012 WL 1945510, at *13.  In fact, in its Opinion, the State Court noted that "there is no need to prove 'fault' for a violation of the [NJCFA] or the underlying breach of contract claim."[109]

In this case, the State Court did not make any finding of "fault," fraud, justifiable reliance or an intent to deceive by Debtor, nor was it required to in determining liability under the NJCFA. Accordingly, the State Court Opinion is not by itself sufficient to find Debtor's debt to Plaintiff to be nondischargeable.[110]

## V.    CONCLUSION

For all these reasons, the Court finds that Plaintiff has failed to meet its burden of proving by a preponderance of the evidence that Debtor's debt to Plaintiff is nondischargeable.  The Court also determines that Plaintiff's prosecution of this action was substantially justified.  Thus, no costs or fees are awarded under 11 U.S.C. § 523(d).

---

[108] Op., at 6.

[109] Op., at 8.

[110] *Compare In re Altieri* and *In re Purington, supra*, where the contractor's debt was found to be dischargeable, notwithstanding the State Court's findings of violation of the NJCFA, with *In re Sevastakis*, 591 B.R. at 205-07, where the State Court's judgment included specific findings sufficient to support an intent to deceive.

A conforming Order and Judgment is being entered simultaneously with this Opinion.

_____
VINCENT F. PAPALIA
United States Bankruptcy Judge

Dated:  December 15, 2021